OZAN LUMBER COMPANY *v.* BISHOP.

4-6577                                         158 S. W. 2d 685

Opinion delivered January 26, 1942.

*Tompkins & McRae* and *S. Hubert Mayes,* for appellant.

*G. W. Lookadoo,* for appellee. ·

GRIFFIN SMITH, C. J.   The questioned judgment is for $5,000 in favor of W. G. Bishop, who sustained personal injuries when struck by a falling plank March 26, 1940.

Red Russell, Donnie Brown, and appellee were wrecking "stalls," or "bins," preparatory to new construction. Appellee testified that immediately preceding the injury he had been knocking planks from studdings.

Russell was at one end of the planks and appellee was at the other end. They began at the top and worked down. Brown "cleaned up" and carried the lumber away, or stacked it, as the carpenters made it available.

Appellee says he "turned and walked into the hall." While stooping "to knock some nails out" Russell hallooed, "and the plank hit me like lightning and I went down on my knees." Russell, he said, knocked the plank loose. Appellee insists he "heard the lick" (presumably referring to Russell's act in hammering) and was almost immediately struck on the back of the neck. Bishop and Russell, according to the former's testimony, "came out of the stall," then both went back. Appellee stepped in front of Russell, but says he did not know where Russell was just before the plank fell. The planks were 1 x 6 inches with sufficient space between to permit the workers to climb the bins.

At the time of the injury appellee had knocked his end of the plank free from the studding, and it had fallen to the floor, leaving the opposite end attached, the plank resting at an angle.

Appellee was treated by Dr. Ross once or twice a week for two months, "and then I quit him." No further medical treatment was administered other than drugs prescribed by Dr. Ross to prevent appellee's kidneys from acting too freely. No other doctor was engaged until January 28, 1941. At that time appellee's attorney went with him to see Dr. McGill in Little Rock. McGill made an examination, but no treatment was prescribed. The doctor testified that he found appellee "partly paralyzed on the left side from an injury to the cord to his neck." The patient also had diabetes insipidus, a condition which causes the sufferer to pass large quantities of urine, which is mostly water, free from albumen or sugar: "It is an incurable condition principally caused by a nervous condition and syphilis." The doctor thought the injury he found could have been produced "by a lick from a plank, which fell and hit him on the neck about the seventh vertebrae."

Dr. D. A. Rhinehart, of Little Rock, who specializes in X-ray work, made pictures of appellee May 14, 1940.

The neck and upper part of the back between the shoulders were X-rayed. The result revealed normal conditions. There was no evidence of anything to cause diabetes insipidus.

Dr. Joe F. Shuffield, of Little Rock, an orthopedic or bone surgeon with 18 years of practice, examined appellee twice. The first occasion was May 14, when the patient was brought to him by Dr. Ross. Shuffield had the benefit of X-ray pictures made by. Dr. Rhinehart. Appellee was given a complete physical examination, including urinalysis. The urine was normal. There were no evidences of an injury.

The second examination was March 25, 1941. At that time the doctor was given a copy of the complaint appellee had filed, in which various ailments were enumerated:—''I examined him for injuries to his cervical vertebrae and entire spinal cord and ligaments, nerves and muscles of his spinal column, and I found no evidence of any such condition. I examined him for partial paralysis to his entire left side, including his left arm and leg, and found no evidence of paralysis in his left arm or leg. . . .. I did not find any evidence of diabetes insipidus. The specific gravity of the urine he passed in my office was 1,024. A diabetes patient's specific gravity generally runs 1,001 to 1,003. I had a blood sugar test made and had the benefit of that report. There was nothing in that report to indicate diabetes insipidus. His blood sugar was 126 milligrams per 100 cc. Normal is 120.''

Red Russell testified that appellee attempted to knock a plank loose ''from the back side.'' This witness said: ''He started hammering and I had my back turned. I was climbing the wall. I turned around, and Bishop was hammering on the 2 x 4 studding just under the nail. I saw the board turn loose and [shouted a warning]. The board came on down and hit him. He had no time to move.'' Russell further testified that he was working ''on the second partition away from Bishop! . I was at the top, about fourteen feet—had climbed to the top and was not doing anything.'' When the accident

occurred Russell had not gotten to the place where he intended to work, and did not hit the plank.

Donnie Brown testified: "Mr. Bishop was whipping on the bottom of the studding, and [in doing so] it knocked the lumber out of the studding, and the plank came down on his neck."

Conceding that on the question of permanent injury a question was made for the jury—although clearly a preponderance of the evidence appears to be to the contrary—we think appellee's written statement, made three days after the injury, is conclusive on the question of negligence. In it appellee said: "We had taken several boards out which had been in the same position, but we could not reach the one which fell on me. We had been pulling on this board with our hands and hammering on the lower end of it, but had been unable to get it off. Mr. Russell said he was going up in the bin. He found that he could not get to the board, and he was just sitting there watching me. I had by that time started hammering on a piece of 2 x 4 on the floor—a part of the old bin we were taking out. This piece of 2 x 4 was nailed to the upright which the piece of 1 x 6 that fell on me was attached to. It was the jarring and shaking of the upright caused by my hammering on it that caused the piece of 1 x 6 to fall on me. . . . I have read the above statement, which is correct." It was signed by Bishop and his wife.

It is true appellee testified that he did not read the statement; that a Mr. Johnson came to his house and said all he wanted was a description of the accident:—"He drew up that thing without much information from me." When asked if he talked with Johnson and attempted to detail to him what the situation was, appellee replied, "Partly so." Appellee then said, "We had been told I would be taken care of."

Bishop admitted his signature. The statement, written with a typewriter on ruled paper, is signed in ink. Preceding Bishop's name are the words: "With recourse."

· While appellee denied knowing what was in the writing, or that he read it, he did not say it was untrue. Its verity is challenged only by appellee's contradictory testimony.

But why, if Bishop did not read the statement, did he take the precaution to write "With recourse"? He undertakes to explain his conversation with Johnson by saying it was understood he was to be taken care of. As a matter of fact, he was sent to Dr. Ross, the company physician.

The credibility to be accorded a witness is ordinarily for the jury. However, no judicial system having justice as its object should permit one who claims he was injured in a particular way to detail in writing just how the accident occurred, and then, when told by a physician of his attorney's choosing months later that he has an incurable malady of uncertain origin, change the facts to suit new conditions, allowing such claimant, in order to establish liability he had formerly disclaimed, to repudiate a statement made when the facts were fresh in mind—a statement not obtained through coercion, misrepresentation, duress, or by overreaching. No one reading the original wherein appear the words "With recourse," penned in the handwriting of appellee immediately preceding his name, can have the slightest doubt as to its genuineness. Verity of the statement is reinforced by appellee's testimony, given during the trial, that he did not know where Russell was just before the plank fell.

All other evidence supports explanations made in the writing. It must be held, therefore, that the judgment does not rest upon substantial testimony; hence, it must be reversed and the cause dismissed. It is so ordered.

Mr. Justice FRANK G. SMITH and Mr. Justice HUMPHREYS dissent. Mr. Justice MEHAFFY did not participate in the consideration or determination of this case.

SMITH, J. (dissenting). If it were conceded that the verdict is grossly excessive and, for that reason, should be reduced, yet that is not what the majority do. The

judgment is not reduced; the cause of action has been dismissed.

It is undisputed that appellee received an injury for which he should have compensation, if appellant is liable for that injury. Indeed, the majority opinion concedes that the testimony is sufficient to support the finding that the injury is permanent, although it is stated that such a finding would be clearly against the preponderance of the evidence. Needless to say, that is a question for the jury, and not for us.

But the majority hold that appellee should receive nothing notwithstanding his injury. It does not appear to be seriously questioned that appellee's own testimony, and other testimony in his behalf, makes a question for the jury as to appellant's liability for the injury. The decision is put upon the ground that appellee's written statement shows there was no liability, and it is said that he did not testify that this written statement was untrue. He may not have denounced it as false, but the purport of his testimony at the trial is that the written statement was false. He certainly did not admit at the trial that the written statement was true. Had he done so, the learned trial judge would, no doubt, have directed the jury to return a verdict against him.

The situation presented is not at all unusual. It is one which has occurred in scores and scores of cases, as is reflected in innumerable personal injury opinions rendered by this court. It has never been held that a plaintiff whose testimony at the trial established liability for an injury may not recover for the reason merely that he had previously signed a statement from which it appeared that his injury was not occasioned by the master's negligence. It has always been held competent to contradict the plaintiff by the production of such evidence, just as it is competent to prove any other statement by the plaintiff against his interest.

It must be remembered that the writing was not a compromise and settlement of plaintiff's injury, and was not offered in evidence as such. Its only purpose was to contradict the testimony of the plaintiff given at the

trial, for which purpose it was, of course, competent. No consideration was paid plaintiff as compensation, in whole or in part, for his injury, and no contention is made that the writing was in any sense a settlement or release.

Plaintiff testified, as the majority opinion recites, that the facts stated in the writing were obtained, "partly so," from him, and that he signed the writing, as did his wife, who knew nothing, and did not profess to know, anything about the injury, and that he signed the paper without reading it upon the representation that this was necessary for the company to take care of him. This may not have been true, but the truth of this testimony was a question for the jury, and not for us.

Had this writing been contractual in its nature (but it was not), executed for a consideration, in settlement and release of liability for the injury, it would not have been binding had its execution been procured through fraud or misrepresentation as to its contents and purposes.

Appellee testified that he signed the paper in a truck, without opportunity to read it, and that on account of the condition of his eyes he could not read it, and under the impression, induced by Johnson, the company's adjuster, that it was all for the purpose of having the company take care of him. Johnson was not called to contradict this testimony, and it stands undisputed in the record.

Let it here again be called to mind that the writing was not a release, and even though it were it would not necessarily bar the suit. It was held in the case of *Union Compress & Warehouse Co.* v. *Shaw*, 187 Ark. 249, 59 S. W. 2d 1021, that, while one may not avoid the effect of a release by proof that he did not read it when he signed it or know what it contained, he might avoid the release by showing that he was induced to sign by deception practiced upon him, whether such deception was intentionally fraudulent or not. There are many other cases to the same effect, one of these appearing in the last volume of our printed reports, the case of *Harmon* v. *Harrison*, 201 Ark. 988, 147 S. W. 2d 739.

In my opinion, the writing did not bar this suit, and was of evidentiary value only to contradict the testimony given by appellee at the trial, and the cause should not be dismissed.

The views here expressed accord with the decision of this court in the case of *Public Utilities Corp.* v. *Corden,* 182 Ark. 858, 32 S. W. 2d 1058, presenting the same state of facts.

I am authorized to say that Justice HUMPHREYS concurs in the views here expressed.